UNITED STATES of America,
Appellee,

v.

Frank COLACURCIO, Appellant.

Nos. 72-2313, 73-1025.

United States Court of Appeals,
Ninth Circuit.

May 29, 1974.

Malcolm L. Edwards (argued), Seattle, Wash., for appellant.

Stuart F. Pierson, Asst. U. S. Atty. (argued), Stan Pitkin, U. S. Atty., Douglas D. McBroom, Asst. U. S. Atty., Seattle, Wash., for appellee.

OPINION

Before KOELSCH and WRIGHT, Circuit Judges, and BELLONI,* District Judge.

KOELSCH, Circuit Judge:

By this appeal, Frank Colacurcio seeks reversal of the district court's adjudication of his guilt of conspiracy to violate (Count I) and the violation (Counts II,

---

* The Honorable Robert C. Belloni, Chief Judge, United States District Court for the District of Oregon, sitting by designation.

III, IV and V) of the "travel" section of the Anti-Racketeering Act (18 U.S.C. § 371, 18 U.S.C. § 1952)[1] and of the district court's orders denying him a new trial.

Briefly stated, Count I of the indictment charged that Colacurcio, together with co-defendants Charles Berger and Harry Hoffman, conspired to open and conduct bingo games in Seattle, Washington, in violation of the penal laws of that State. Included in the count are allegations that the three persons, in furtherance of the conspiracy, used the facilities of interstate commerce to bring gambling paraphernalia to Seattle from the State of Colorado; that Berger managed and operated the illicit gambling enterprise; that Colacurcio secured local police protection for it; and that Hoffman organized bingo clubs.

Counts II, III, IV and V each specified a separate occasion when the accused utilized interstate facilities to order and transport equipment used for gambling.

The charges were tried to the court, sitting without a jury. Berger was granted immunity and dismissed from the case in return for his testimony as a witness for the prosecution. Hoffman

was acquitted; but Colacurcio was found guilty on all five counts.

We will group related assignments together and discuss them under appropriate headings.

## 1. The Prosecution's "Interference with Counsel"

Several months after the indictment was returned, one of the government's key witnesses, Betty Luke, came to the district attorney with a story which suggested that Colacurcio and a lawyer, now deceased, not Colacurcio's, had met with her for the purpose of discussing a bribe not to testify. The district attorney had thereupon subpoenaed Ronald G. Colacurcio's chief counsel, Neubauer, to appear before a grand jury and there interrogated him about the matter. Neubauer immediately complained to Judge Solomon, the then presiding judge, who, after severely reprimanding the district attorney, warned him that the case would be dismissed if he called Neubauer as a witness or attempted to use his grand jury testimony at the upcoming trial.[1a]

When the case, in due course, was thereafter assigned for trial to Judge Powell, Colacurcio formally moved for dismissal.[1b] He urged that the district

---

1. "18 U.S.C. § 371. Conspiracy to commit offense or to defraud United States. If two or more persons conspire either to commit any act to effect the object of the conspiracy . . . and one or more of such persons do any act to efect the object of the conspiracy, each shall be . . ." punished.

"18 U.S.C. § 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises.

"(a) Whoever . . . uses any facility in interstate or foreign commerce, including the mail, with intent to—

\* \* \* \* \*

(3) . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be . . . (guilty of a penal offense).

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, . . . in violation of the laws of the State in which they are committed. . . ."

1a. "I was somewhat relieved," Judge Solomon stated, "when I read the transcript before the Grand Jury. But I asked myself: 'How is it possible to protect a lawyer when you ask him the questions you did ask him?' For example, if he wanted to use this testimony to destroy the credibility of this witness (i. e., Betty Luke), hasn't he, by the testimony he gave to the Grand Jury, absolutely destroyed his cross-examination of that witness?"

Concluding, Judge Solomon admonished the United States attorney thus: "I don't think you are going to do that (i. e., call Neubauer as a witness). You can't force a lawyer to testify in one case and then use his testimony against his client. If you attempt to do this, I will dismiss the case . . . ."

1b. In the alternative, the motion to dismiss requested an order directing the district attorney to permit inspection of the grand jury transcript and other documents. Judge Powell denied this alternative.

attorney, by calling and interrogating Neubauer, had materially impaired the latter's ability to function as defense counsel and thus violated Colacurcio's constitutional right of due process and to effective representation by counsel.[2] Judge Powell held a hearing. After considering the lengthy affidavits, the transcript of the grand jury inquisition and the other written statements submitted for *in camera* inspection, Judge Powell denied the motion.[2a]

■ We fully share the views expressed by Judge Frankel in Re Terkeltoub, 256 F.Supp. 683 (D.C., S.D.N.Y. 1966), that generally it is grossly improper for a district attorney to seek to compel a lawyer to testify concerning his work in preparing a defense for his client. The likelihood that this drastic move will have at least a slightly chilling impact upon the lawyer's advocacy is indeed great, but more important, perhaps, is the invasion of the lawyer's privacy in his preparation. Any such inquiry can ordinarily be deferred to a less critical time without seriously hampering the district attorney in fulfilling his duty to protect the integrity of the judicial process.

■ We nevertheless are not persuaded that Judge Powell's ruling requires a reversal. Judge Powell, in this case, unlike Judge Frankel in *Terkeltoub,* had before him both the lawyer's grand jury testimony and the materials presented *in camera*; here the inquisition was *a fait accompli*, while in *Terkeltoub* it was simply incipient; and, likewise, here Judge Powell entertained and considered the *in camera* matters which Judge Frankel had rejected (although with the significant observation that, "It is possible, of course, that further information could lead to a changed conclusion." (p. 686)).

From our own study of all these materials, we are satisfied, as was Judge Powell, that the inquiry extended wholly to matters collateral to the criminal case and that Neubauer's professional talents were in nowise appreciably impaired.[2b]

## 2. The "Conditional Waiver" of Jury Trial

■ The day before trial was to begin, Hoffman, Colacurcio's codefendant, was unexpectedly stricken with a heart attack and taken to a hospital. However, through his lawyer he expressed the wish that the trial not be postponed but that it proceed against him in absentia, "even if the result is a conviction."

After much consideration of the problem, Colacurcio also decided not to seek a postponement and to immediately proceed without a jury. Both he and Hoffman filed the necessary waivers. After eight days of trial, the respective parties had submitted all their evidence, save for that which Colacurcio expected to adduce from Hoffman. Judge Powell thereupon declared an indefinite recess until such time as Hoffman was physically able to give testimony. But Hoffman's condition continued unchanged. Four months later, when the fact was manifest that Hoffman could never appear or testify, Judge Powell terminated the recess and, over Colacurcio's objection, proceeded with the trial to its con-

---

**2.** Colacurcio did not assert as a further ground a violation of the attorney-client privilege. He apparently recognized that since the discussion included a third party, the privilege did not attach.

**2a.** The district attorney, resisting the motion, argued in substance that his investigation which led to calling Neubauer before the grand jury was not related to the pending criminal prosecution against Colacurcio, but was launched to determine whether Colacurcio or Luke was endeavoring to obstruct justice.

**2b.** Judge Powell made the comment that the matter was "collateral." In addition, he made the statement, ". . . I do feel that Mr. Neubauer is a very capable and competent, energetic, enthusiastic advocate. I think he is well capable of taking care of himself and representing his client. I don't think his client has been jeopardized in the least up to this point, and I will deny his motion to dismiss."

clusion. He acquitted Hoffman, and as noted earlier, found Colacurcio guilty on all counts.

Colacurcio's written "Waiver of Jury Trial" is concise and unequivocal.[3] Nevertheless, he contends that it should be treated as conditional only, the condition being Hoffman's giving of testimony.

Colacurcio likens his position to that of the plea bargainer in Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1941). He points out that "[e]very plea bargain involves the waiver of a trial by jury conditioned upon the happening of a subsequent event. In the plea bargain cases, the waiver of trial by jury is the guilty plea. The condition subsequent is the promise by the prosecutor . . ." concerning sentence, etc. He argues that here, when the future event could not occur, his waiver became ineffective. We are not persuaded. The "unkept promise of the prosecutor" in Santobello has no counterpart in this case. Fault cannot be attributed to either the prosecutor or the judge. Hoffman's physical condition obviously was beyond the control of either the judge or the prosecutor. With commendable candor, Colacurcio concedes that when the waiver was entered, everyone stood on an equal footing and that they did not discuss what the effect might be of Hoffman's permanent testimonial disability.[4] The hard fact emerges that the contingency was simply not contemplated at all, and nothing in this record justifies the engrafting of any condition onto the waiver. In sum, and as succinctly stated in United States v. Sadrzadeh, 440 F.2d 389, 390 (9th Cir. 1971):

"We cannot accept the contention that (appellant) was entitled to start over again at the end of the government's case with a jury and not a judge when his wife Toni chose to plead guilty. Both had previously intelligently waived a jury. The trial court simply has to get on with its business and cannot give parties first a practice trial before the court and then summon a jury."

3. The Scope of 18 U.S.C. § 1952 [5]

 Colacurcio is simply mistaken in his contention that (a) Section 1952 does not apply to this bingo operation because "the bingo clubs were local in nature and . . . all of the supplies used in these clubs were available from Ace Novelty Co. of Seattle . . . ." and in his related contention that (b) the statute is limited to those who engage in "organized interstate criminal activities" and is "aimed at interstate racketeers conducting an unlawful business in one state while living in another." United States v. Roselli, 432 F.2d 879 (9th Cir. 1970), contains an exhaustive exposition of the purpose and coverage of the statute; and what we said there

---

3. "WAIVER OF JURY TRIAL"

"Pursuant to Rule 23(a) Federal Rules of Criminal Procedure, the undersigned Frank Colacurcio, defendant, does hereby waive his right for trial by jury and requests that it be tried without a jury. I fully understand that I am entitled to a jury trial, but it is my desire to waive that right.

"DATED June 16, 1971.

 "/s/ Frank Colacurcio
 Frank Colacurcio, Defendant
 "/s/ Ronald G. Neubauer
 Attorney for Defendant Frank Colacurcio"

4. Colacurcio also attacks the waiver as not intelligently made in that he was not apprised, before making his election to forego a jury and constitute Judge Powell the fact finder, of the precise content of the *in camera* matter which the district attorney had previously submitted to the judge when opposing the motion to dismiss the action on the ground of "interference with counsel."

As a separate point, he urges that the "in camera" matter probably tended to prejudice Judge Powell against him.

Neither has merit. We think it enough that Colacurcio knew that *in camera* matter has been submitted; surely he must have realized that some of it was unfavorable to him. Moreover, he made no demand to inspect it prior to making his decision. The short answer to the second point is that judicial integrity is not so lightly regarded as Colacurcio suggests. Dedmore v. United States, 322 F.2d 938 (9th Cir. 1963).

5. Footnote 1, *supra*.

about those matters will not be repeated except for the following quotation: "It is quite clear that in enacting Section 1952, Congress was not concerned with regulating interstate travel or the use of interstate facilities, but rather with directly suppressing unlawful local activities from which organized crime drew its sustenance." (*Roselli, supra*, p. 891.)

 In this regard, too, Colacurcio's further contention to the effect that the government failed to prove that he conspired to violate "federal law" is likewise fallacious. Of course, such proof was essential to a conviction. Pereira v. United States, 347 U.S. 1, 12, 74 S.Ct. 358, 98 L.Ed. 435 (1953). But a finding of guilt did not require proof that the conspirators agreed to use interstate facilities to advance their conspiratorial purpose to violate the Washington anti-gambling law: " . . . . the knowing use of interstate facilities is not an essential element of either the substantive offenses or the conspiracy to commit them; . . . . " United States v. Roselli, *supra*, p. 890. However, we do note that the record contains evidence sufficient to support a finding that the parties had agreed to order gambling paraphernalia from the State of Colorado.

### 4. The Illegally Seized Evidence

 Judge Powell was correct in ruling that Colacurcio lacked standing to challenge the legality of the search of the Lifeline Club and in permitting the use as evidence against him of the incriminating records and other papers incidentally seized. Colacurcio was not a person "aggrieved" (Rule 41(e), F.R. Crim.P.): He was not, as in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), charged with a "possessory" crime and hence entitled

to "automatic" standing; neither was he on the club premises at the time of the search, not did he establish any proprietary or possessory interest in the seized property.[6] Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1972), applies.

### 5. The "Recanting" Witness

 As one of his many grounds for new trial, Colacurcio asserted that Betty Luke had given perjured testimony. His showing in support of the motion was not contained in an affidavit by Luke herself but was the more common recantation "once removed"—*i. e.*, the sworn statement of third parties to the effect stated. But despite Colacurcio's weak showing in support of his motion, Judge Powell conducted a hearing.[7] Luke appeared as a witness. She flatly denied the accusation of perjury and reaffirmed the truth of her trial testimony. Judge Powell credited her. For that reason it is immaterial that his oral formulation of the legal standard for granting a new trial departs in a measure from the one generally approved. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

 Moreover, the finding of nonperjury rendered Colacurcio's proof of recantation simply impeaching. This latter type of evidence "is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956).

### 6. The Prosecution's Failure to Produce

 The record does indeed reveal that the district attorney did not produce for Colacurcio's inspection all recorded statements and documents of

6. It is significant that Colacurcio did not testify at the suppression hearing. Yet, if he actually had some proprietary interest in the seized papers, he could have asserted it without thereby providing the district attorney with evidence that could later be used to inculpate him. Simmons v. United States,

390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

7. Such motions are ordinarily decided solely upon affidavits. Indeed, the Fifth Circuit has declared that only in exceptional circumstances should hearings be held. Lyles v. United States, 272 F.2d 910 (5th Cir. 1959).

the witness Luke, to which Colacurcio was entitled under the Jencks Act.[7a] However, a comparison of those withheld with those actually produced discloses that the statements in all of them are consistent with each other and are uniformly the same. Thus the conclusion is manifest that inspection of the withheld materials would not have afforded Colacurcio any real aid in his defense.[8]

██ Colacurcio's syllogism as it relates to his demand to inspect the fruits of the investigative activities of F.B.I. agents Friang and Smith lacks its essential major premise. In their affidavits the agents deny taking notes of their conversation with and making a report of their interview with the witness Luke. These statements are unchallenged. Neither was the district court required, as a pre-condition to deciding Colacurcio's motion for inspection, to hold an evidentiary hearing on the issue and permit Colacurcio to cross-examine the agents. What we said in United States v. Clay, 476 F.2d 1211, 1216 (9th Cir. 1973), is relevant: "Assuming the trial court, in its discretion, may hold an evidentiary hearing, we hold that the trial court here did not abuse that discretion."

Colacurcio's remaining points are not of sufficient substance to warrant discussion.

The judgment is affirmed.

---

**7a.** The particular documents were those submitted by the district attorney (for Judge Powell's *in camera* perusal) at the "interference with counsel" hearing. Colacurcio was not afforded access to them until after trial.

**8.** Additional support for our conclusion is found in the affidavit of Thomas H. S. Brucker, one of Colacurcio's attorneys. In support of the contention that the "in camera" materials probably tended to prejudice Judge Powell (see footnote 4), he averred, after opining how critical the credibility of a witness was in a conspiracy case, that "I would never have proposed to Mr. Colacurcio that he waive his right to trial by jury if I had been aware that the information contained in the in camera material was known to the trial judge, particularly so shortly prior to the trial date. I state this because:

"1. The affidavits provided prior consistent statements that supported the trial testimony of Betty Luke, at a trial where evaluation of credibility determined the guilt or innocence of a defendant;

"2. This prior consistent statement completely, and unknowingly to the defendants, undercut the cross-examination of Betty Lou Luke;

"3. These affidavits independently corroborated the direct testimony of Betty Lou Luke and deprived the defendant of his opportunity to cross-examine;

"4. These affidavits meant that Judge Powell, to find the defendant Colacurcio not guilty, would necessarily have to disbelieve the trial testimony of the witness Luke—which testimony was substantially identical to testimony in her prior affidavits upon which two other federal district judges had relied to authorize phone tapping and recording of conversations; . . . . ."