Commonwealth *v.* Dembo, Appellant.

Argued September 28, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

2

*Brian E. Appel,* with him *Bernard L. Segal,* and *Segal, Appel & Natali,* for appellant.

*Paul D. Shafer, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE NIX, March 16, 1973:

Micah Dembo was convicted by a jury for possession of approximately eight ounces of hashish and a small quantity of marijuana seeds in violation of The Drug, Device and Cosmetic Act.[1] Motions for a new trial and arrest of judgment were denied and appellant was sen-

---

[1] Act of September 26, 1961, P. L. 1664, §20(c), *as amended,* 35 P.S. §780-20(c). We note that this Act has been repealed by The Controlled Substance, Drug, Device and Cosmetic Act of April 14, 1972, 35 P.S. §§780-101 to 780-143 (Purd. Legis. Service 1972). Significantly, however, section 39(a) of the new Act provides in part:

tenced to pay a Five Hundred Dollar ($500.00) fine and costs, to serve a term of probation for three years, and to undergo imprisonment during college vacation periods and an additional thirty days imprisonment upon graduation. The Superior Court affirmed the judgment of sentence and this appeal followed.

The pertinent facts are as follows: At the time of his arrest appellant was a twenty year old college student residing in Meadville, Pennsylvania. In October, 1969, a Pennsylvania State Trooper, Alan R. Phillips, received information from an agent of the Federal Narcotics Bureau that the appellant had purchased a quantity of lithium aluminum hydride which is frequently used in manufacturing the hallucinogenic drug lysergic acid diethylamide, commonly known as LSD.[2] Trooper Phillips then requested the postal authorities in Meadville to notify him if any packages arrived in the mail for Dembo.

On December 29, 1969, two and one-half months later, the assistant postmaster notified Trooper Phillips that a package had arrived addressed to appellant. At the request and direction of the trooper, the postal authorities opened the package, which was shipped by fourth class mail, and discovered a bamboo lamp which contained eight ounces of hashish.[3] Trooper Phillips

---

"Prosecution for any violation of law occurring prior to the effective date of this act is not affected or abated by this act."

[2] The Commonwealth does not contend that there was anything illegal either in the mailing or possession of this substance. The interest of the police was only as to the possibility that it was being used in the manufacture of LSD, which is a dangerous drug. The Drug, Device and Cosmetic Act, *supra*, 35 P.S. §780-2(h). *See* 21 U.S.C.A. §812(c), Schedule I(c)(9).

[3] Possession of hashish is prohibited under section 20(c) of The Drug, Device and Cosmetic Act, *supra*, 35 P.S. §780-20(c), which provides in pertinent part: "Any person who possesses any narcotic drugs [35 P.S. §780-2(g)'] in violation of the provisions of this act shall be guilty of a felony. . . ."

directed that the package be carefully rewrapped and delivered to the appellant the following morning. Phillips then obtained a search warrant for appellant's premises, the affidavit alleging the earlier purchase of lithium aluminum hydride and the discovery of the hashish inside the lamp. Immediately after the regular postal delivery of the package, Phillips, accompanied by a detective and a state narcotics agent, executed the warrant and confiscated the package with the hashish, an envelope containing marijuana seeds[4] and incriminating correspondence to appellant from an individual in India implying that drugs were to be sent to appellant.[5]

Appellant's primary contention is that opening the package at the post office and inspecting its contents was an unconstitutional search in violation of the Fourth Amendment.[6] He urges that since the search warrant used to gain entry into his home was secured by the exploitation of the information obtained by this illegal search, all of the subsequently discovered evidence implicating him was inadmissible. We agree.

Congress has provided: "(a) The Postmaster General may prescribe the manner of wrapping and securing mail not charged with first class postage so that the contents of the mail may be easily examined. He shall charge the first class rate of postage on all matter which cannot be examined easily.

"(b) To ascertain whether the proper rate of postage has been paid, postmasters may examine second

---

[4] See note 3, supra.

[5] Appellant's motion to suppress the evidence seized was denied as were his post-trial motions which were based primarily on the court's refusal to suppress.

[6] U. S. Const. amend. IV, reads in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

class mail and remove the wrappers and envelopes from other mail not bearing first class postage if it can be done without destroying them." 39 U.S.C.A. §4058.

Pursuant to this congressional enactment the Postmaster General promulgated the following postal regulation: "Fourth-class mail must be wrapped or packaged so that it can be easily examined. Mailing of sealed parcels at the fourth-class rates of postage is deemed to be the consent of the sender to postal inspection of the contents. To assure that their parcels will not be opened for postal inspection, patrons should, in addition to paying the first-class rate of postage, plainly mark their parcels *First Class* or with similar endorsement." Federal Postal Regulation 135.7, 39 C.F.R. §135.7.

From these provisions it is obvious that one who chooses to transmit a parcel through the mails using fourth class postage accepts the possibility that the contents will be examined by postal authorities in the performance of their duties. We cannot, however, accept the Commonwealth's position that the above-mentioned congressional enactment and the regulation pursuant thereto completely remove fourth class mail from the protection of the Fourth Amendment. The importance of the right to be secure in the use of the mails has long been recognized. The United States Supreme Court pertinently observed in *Ex Parte Jackson*, 96 U.S. 727, 733 (1877) : "Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail,

they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household. *No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the Constitution.* (Emphasis added.)

It is clear that Congress in the case of fourth class mail granted to postal authorities the right of inspection for the *sole purpose* of determining whether the size, weight and contents were in accordance with postal regulations. There is no justification for interpreting the waiver of the sender to be any broader than the purposes behind the legislative enactments. Contrariwise, it is well settled that the Fourth Amendment must be construed liberally to safeguard the right of privacy. The importance of the Fourth Amendment guarantees was set forth by the Supreme Court in *Gouled v. United States,* 255 U.S. 298, 303-04 (1921) : "It would not be possible to add to the emphasis with which the framers of our Constitution and this court have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments [Fourth and Fifth]. The effect of the decisions cited is : that such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen,—the right, to trial by

jury, to the writ of *habeas corpus* and to due process of law. It has been repeatedly decided that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers." (Citations omitted.)

We hold that, except for the limited purpose intended by Congress in granting the postal authorities the right to inspect fourth class mail, these parcels fall within the penumbra of constitutional rights protected by the Fourth Amendment. Therefore, since the package in question is within the protection of constitutional prohibitions against unreasonable searches and seizures, it follows as a matter of course that the appellant, as the addressee of the package and the person aggrieved by the search, has standing to challenge the legality of the search at the post office. Clearly, the appellant was the "one against whom the search was directed. . . ." *Jones v. United States,* 362 U.S. 257, 261 (1960). *See People v. Moraitis,* 63 Misc. 2d 344, 312 N.Y.S. 2d 175 (1970).

The precise issue before us is whether a search is constitutionally proscribed and the fruits subject to the doctrine of exclusion where it is shown that the postal authorities only exercised their right of inspection at the behest of police officers. Here, the record is clear that the postal authorities were merely a tool used by the police officials to further a police investigation. The record is barren of any facts that would have permitted the police officials in the case at bar to open this parcel and examine its contents. The Commonwealth seeks to sustain the search relying upon the fact that the postal authorities physically opened the package and not police officials. The Fourth Amend-

ment reaches the very core of the American concept of the dignity of the individual, thus to allow its protection to be defeated by the most obvious subterfuge would reflect little deference to a heritage we have given so much to sustain. In resolving this question we are mindful of the Supreme Court's admonition in an analogous situation: "[D]ecisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" *Stoner v. California,* 376 U.S. 483, 488 (1964). *See also Chapman v. United States,* 365 U.S. 610 (1961); *United States v. Jeffers,* 342 U.S. 48 (1951).

The overwhelming evidence forces the conclusion that this search was initiated by police officials in furtherance of a police investigation then in progress and the postal authorities were merely the means selected in an attempt to avoid the necessity of establishing probable cause.

The Commonwealth's reliance on *Santana v. United States,* 329 F. 2d 854 (1st Cir. 1964), *cert. denied,* 377 U.S. 990 (1964), is obviously without justification. It is the very difference between the factual situation in *Santana, supra,* and the case at bar to which appellant has addressed his objection and which we find constitutionally offensive. There a postal clerk in the performance of his duties opened a package containing lottery tickets and reported that information to the police.[7] Unlike the facts before us, where the postal authorities were no more than an instrument used by police officers to further their investigation, the postal clerk in *Santana* opened the package in furtherance of

---

[7] The postal clerk opened the package because, for some unknown reason, he was under the impression that it contained nonmailable meat delicacies.

postal business and the court properly refused to suppress the fruits of the search.

While this is a case of first impression in Pennsylvania there are impressive decisions in other jurisdictions condemning artifices designed to avoid the need for probable cause. The leading federal case is *Corngold v. United States*, 367 F. 2d 1 (9th Cir. 1966). There federal customs agents believed that the defendant had delivered certain packages to the airport which contained contraband and they requested an employee of Trans World Airlines to conduct a search pursuant to a right of inspection reserved in the contract of carriage. The court held that the fruits of the search were inadmissible since "[t]he search was in substance a federal search, cast in the form of a carrier inspection to enable the officers to avoid the requirements of the Fourth Amendment." 367 F. 2d at 5. Significantly the court based its holding upon the following considerations: "It would be difficult to justify any conclusion other than that the TWA employee participated in the search solely to serve the purposes of the government. No doubt both the customs agents and the TWA transportation agent relied upon the inspection clause in TWA's tariff and the act of TWA's agent in cutting open the outside package to furnish technical legal justification for the search. But as we have noted, the TWA employee himself testified that he opened appellant's package only because the government agents asked him to, and there is nothing else in the record which would indicate that the package was in fact opened for any purpose of the carrier. . . ." 367 F. 2d at 5. *See also Smith v. Rhay*, 419 F. 2d 160, 162-63 (9th Cir. 1969) (parole officer not entitled to make warrantless search of items in parolee's possession while acting on prior request of law enforcement officials and in concert with them); *Stapleton v. Superior*

*Court,* 70 Cal. 2d 97, 447 P. 2d 967, 73 Cal. Rptr. 575 (1969) (police and private credit card agents planned a joint operation which was aimed at arresting defendant and obtaining evidence against him) ; *People v. Fierro,* 236 Cal. App. 2d 344, 46 Cal. Rptr. 132 (1965) (specific request by police that hotel manager go to defendant's room and seize samples of narcotics).

In our view, the procedure attempted here is comparable to the so-called "silver platter" doctrine, which was overruled in *Elkins v. United States,* 364 U.S. 206 (1960). Under this doctrine, evidence of a federal crime which state police came upon in the course of an illegal search for a state crime could be turned over to federal authorities for use in a federal prosecution so long as federal agents did not participate in the search but simply received the illegal evidence on a "silver platter". In condemning this practice the Court stated: "Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged. Yet that kind of cooperation is hardly promoted by a rule that implicitly invites federal officers to withdraw from such association and at least tacitly encourage state officers in the disregard of constitutionally protected freedom. If, on the other hand, it is understood that the fruit of an unlawful search by state agents will be inadmissible in a federal trial, there can be no inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigations." 364 U.S. at 221-22.

That courts should constantly look beneath the surface of apparently reasonable conduct to determine illegal police behavior seems well established. As the United States Supreme Court noted in *Byars v. United States,* 273 U.S. 28, 33-34 (1927) :[8] "The Fourth Amend-

---

[8] In *Byars* the Court held that an illegal search and seizure was the act of the United States and violated the Fourth Amendment

ment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right."

When the Supreme Court had occasion to interpret *Byars* in *Lustig v. United States,* 338 U.S. 74 (1949),[9] it noted, in determining whether a federal official participated in a search, that: "The decisive factor . . . is the actuality of a share by a federal official in *the total enterprise* of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it." (Emphasis added.)

In the case at bar, there can be no doubt that the police actively participated in the search of the package addressed to the appellant. To permit such concerted effort among the police and postal authorities in an attempt to circumvent the appellant's constitutional rights cannot be done.

Accordingly, we hold that this warrantless, exploratory search was violative of the Fourth Amendment and the evidence seized pursuant thereto is inadmissible. Further, we believe that all of the evidence implicating

---

because of the substantial participation in the search and seizure by a federal agent.

[9] In *Lustig,* a Federal Secret Service Agent was involved in an illegal search of a hotel room by local police and the Court considered the degree of federal involvement in a state investigation necessary to exclude illegally seized evidence from a federal proceeding.

the appellant was secured by the Commonwealth through exploitation of the information obtained by the illegal search of the package addressed to the appellant and it is all inadmissible for that reason.[10]  *Wong Sun v. United States,* 371 U.S. 471 (1963); *Commonwealth v. Reece,* 437 Pa. 422, 263 A. 2d 463 (1970).

Judgment of sentence reversed.

---

[10] In light of our disposition, we need not pass on appellant's claims that the sentence imposed was illegal, that his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), were violated, that his Fifth Amendment rights were violated, that the warrant to search his home was invalid because it was based on prospective facts only, that the search of his home was beyond the scope of the warrant, and that the defense of entrapment was available to him.