## Commonwealth v. Sweger

*Kevin A. Hess, assistant district attorney,* for the Commonwealth.

*Dale F. Shughart Jr.,* for defendant.

BAYLEY, *J.*, May 10, 1984—

## FINDINGS OF FACT

1. Defendant, Nevin G. Sweger, Jr., is charged with a count of criminal homicide involving the shooting death of his wife, Nancy Sweger, on December 31, 1983.

2. The case was investigated by Trooper Michael M. Brennan, a Pennsylvania State Police Criminal Investigator, with 16 years experience.

3. Decedent's body was discovered in her home after which Trooper Brennan learned that Mr. Sweger had been hospitalized following the incident for a self-inflicted gunshot wound.

4. On the day after the shooting, January 1, 1984, Trooper Brennan went to the Carlisle Hospital at 4:45 p.m. to determine if he could obtain a statement from Mr. Sweger. No charges had been filed at this point although a law enforcement official had been stationed outside the defendant's room.

5. When Trooper Brennan entered the room defendant was in bed and his mother was present. The trooper had not previously talked to defendant or his mother.

6. The trooper introduced himself and identified himself as the police officer conducting the investigation into the case. He told Mr. Sweger that he had established his own theory as to what had happened and that he was conducting the investigation and would want to know from him what happened regarding the crime that took place in the wife's residence. He told him there were only two people who really knew, his son and him, and he really didn't want to talk to his son about it.

7. Mrs. Sweger asked if she should leave the

room and was told by Trooper Brennan that she could stay. She chose to stay.

8. Trooper Brennan was explaining his investigation to Mrs. Sweger when Mrs. Sweger asked her son to cooperate with the police. Without having been asked any questions, Mr. Sweger responded to his mother that "there wasn't much to it, I killed her and that's all there is to it."

9. Before Mr. Sweger continued, Trooper Brennan interrupted him and advised him of his Miranda rights.

10. Trooper Brennan then read to Mr. Sweger the waiver portion of the rights and asked him if he understood them. Mr. Sweger replied that he didn't want to talk to Trooper Brennan at that point and that he thought he should consult an attorney — that he shouldn't say anything without a lawyer present.

11. Defendant then asked Trooper Brennan if he had indeed said he could have a lawyer. Trooper Brennan answered ". . . yes, that's what I said."

12. Mrs. Sweger then asked "he doesn't have to say anything to you without a lawyer, does he?" Trooper Brennan confirmed that he didn't, saying ". . . he can have a lawyer here anytime he wants."

13. Without anything further being said by Trooper Brennan, Mrs. Sweger told her son that "the lesser you say, the harder it will be for you." Her son asked her what she had said and she repeated it, adding, "God would want you to tell what happened."

14. At this point Mr. Sweger began to cry and began recalling the incident. This recall lasted approximately three minutes during which time defendant would stop, think a little bit, add some more, talk to his mother, cry and at times seemed a little angry.

15. During this discourse defendant explained some of the problems he was having with his wife which resulted in him going to where she lived, shooting off the door lock, going inside and confronting her, telling her to put their small son down, and then as he described; "she put him down and I blasted her."

16. After this rambling explanation as to what had happened and the statement about his "blasting her," Trooper Brennan asked "why?" From there on, the trooper continued to ask various questions to which defendant responded and which provided further detail of his activities leading up to and involving the killing.

17. After these questions, the officer left Mr. Sweger and his mother in the room. He then went to a district justice where he filed a charge of criminal homicide. The officer returned to the hospital at approximately 7:00 p.m. with the district justice who arraigned defendant in his room. This was approximately two hours after the initial conversation.

## DISCUSSION

The testimony reveals that defendant shot himself in the area of his ear after he had shot and killed his wife. The motion to suppress claims that he was unable to hear his rights and the discussions that took place with Trooper Brennan and that, therefore, any statements he made should be suppressed.

The evidence is to the contrary. Trooper Brennan testified that there was nothing to indicate to him that Mr. Sweger did not hear him. Defendant responded to and answered his questions and responded to his mother when she talked to him. Defendant's responses to the explanation of his

Miranda rights indicates that he heard and understood them.[1]

When District Justice Cohick came to arraign defendant, he indicated to her that he was not hearing her. She then had Trooper Brennan repeat what she was saying and defendant had no trouble hearing Trooper Brennan. An audiologist who examined defendant and testified for the defense confirmed that her findings were consistent with the fact that defendant could hear the more resonant voice of Trooper Brennan yet would have trouble hearing the higher pitched voice of Mrs. Cohick. From all of the testimony and the manner in which the statements were made, I find as a fact that defendant heard the trooper and his mother, understood his rights and responded to both the trooper and his mother as indicated in my specific findings of fact. Although defendant was hospitalized and being treated for self-inflicted injuries at the time, I find as a fact that his physical and mental conditions were not impaired to any extent that would render his statements involuntary.

Defendant testified that after he was told his Miranda rights, and further read them off a form himself, which he understood, he told Trooper Brennan that he wanted a lawyer but that the trooper persisted three or four times in continuing to ask him questions and threatening to go to his boy and talk to him in an effort to obtain a statement. He stated that he did not remember his mother asking Trooper Brennan whether he did not have to talk without a lawyer being present nor did he ever remember giving any incriminatory statement. He testified that Trooper Brennan was lying in this re-

---

1. Miranda v. State of Arizona, 384 U.S. 436, 88 S.Ct. 1602 (1966).

gard. His mother, who was present that evening and who was present at the suppression hearing, did not testify for either party.

I find as a fact that the sequence of events involving all statements made by Mr. Sweger while Trooper Brennan was in the hospital room are as set forth in my specific findings of fact. Trooper Brennan did not threaten or coerce defendant into making any statements. I find as a fact that the trooper never asked any questions of the defendant until the question "why?" was asked of him after defendant stated that he had "blasted her." I do not accept as credible, defendant's testimony that Trooper Brennan asked or persisted in asking defendant to give a statement after the trooper was told by defendant that he thought he should have a lawyer present.

The defense maintains that all statements made by the defendant should be suppressed. These statements fall into three distinct categories:

(1) The statement in response to Mrs. Sweger's comment, and not in response to any interrogation by Trooper Brennan, that "There wasn't much to it, I killed her and that's all there is to it."

(2) The approximate three minute rambling discourse which ended with the statement that ". . . I blasted her." This statement was not made in response to any questions or interrogation by Trooper Brennan and occurred after Mrs. Sweger told defendant that ". . . God would want you to tell what happened."

(3) The statements made subsequent to Trooper Brennan interjecting the question "why," after the three minute discourse, which then continued on a question and answer basis.

Defendant maintains that there was no explicit waiver of his constitutional rights and therefore, all

statements made by him to Trooper Brennan must be suppressed. In order to begin an analysis of this claim we must first determine whether or not this was a "custody" situation requiring the administration and waiver of Miranda rights. Commonwealth v. McLaughlin, 475 Pa. 97, 379 A.2d 1056 (1977). The issue is whether or not the atmosphere where the defendant was questioned gave rise to "custody" or "deprived him of his freedom in any significant way." Commonwealth v. Marabel, 445 Pa. 435, 283 A.2d 285 (1971). In Marabel, the Supreme Court reiterated Pennsylvania's objective test as follows:

"Custody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. . . . The custody requirement of Miranda does not depend on the subjective intent of the law enforcement officer-interrogator, but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation."

Custody may or may not occur in both police station and non-police station settings. Commonwealth v. McLaughlin, supra. The court must determine the degree of deprivation of liberty and whether or not the freedom of movement of the defendant is restricted by the interrogation. Commonwealth v. Anderson, 253 Pa. Super. 334, 385 A.2d 365 (1978); Commonwealth v. Horner, 497 Pa. 565, 442 A.2d 682 (1982); Commonwealth v. Markman, 320 Pa. Super. 304, 467 A.2d 336 (1983).

In the present case I find that defendant would have reasonably believed that his freedom of action or movement was restricted by Trooper Brennan's presence. He would have known that Trooper

Brennan had information that he had committed the killing as Brennan himself, in effect, told him after he introduced himself. There was a police officer posted outside the hospital door. Although not restrained by the police, defendant's arms were strapped to his bed by medical personnel as he was receiving some type of intravenous medication. Considering all of these factors, I find that the setting was of a custodial nature.

The initial statement made by the defendant that "there wasn't much to it, I killed her and that's all there is to it" was made in response to a comment by Mrs. Sweger. Likewise the defendant's three minute rambling oration which ended with the statement ". . . I blasted her" was made in response to comments made by Mrs. Sweger. At the point where both of these statements were made, Trooper Brennan had not asked the defendant a single question involving the incident, nor had he asked Mrs. Sweger any questions or asked her to ask her son any questions. Both of these statements were volunteered and not in response to any interrogation. They are admissible against the defendant on that basis alone. Commonwealth v. Yount, 455 Pa. 303, 314 A.2d 242 (1974); Commonwealth v. Brittain, 455 Pa. 562, 317 A.2d 219 (1974). The blurting out of a confession under these circumstances was voluntary and not the product of interrogation. Commonwealth v. DuVal, 453 Pa. 205, 307 A.2d 229 (1973).

Defendant maintains that, somehow, Mrs. Sweger was acting as an agent for the trooper and that, in effect, he was tricked by what amounted to vicarious interrogation by the officer. I find as a fact that she was not an agent of Trooper Brennan. He had never discussed this matter with her nor had he asked her to act on his behalf in prompting defend-

ant to discuss the incident. He did not ask her any questions while in the hospital. He responded correctly to the questions of both her and her son involving his constitutional rights. There is not an iota of evidence in the record to support a finding that she was acting as his agent for the government or that the officer tricked her into so acting. The evidence, in fact, is exactly to the contrary. She was concerned for her son's relationship with God. She sought the truth for her son's benefit — she was acting not on behalf of the police, but on behalf of her son. What she said to him is what she individually thought he should do. The responses of the defendant that followed were free and unconstrained remarks of their maker. The defendant's argument fails because I find as a fact that Mrs. Sweger was not acting as an instrument or agent of the government. See Commonwealth v. Borecky, 277 Pa. Super. 244, 419 A.2d 753 (1980); Commonwealth v. Dembo, 451 Pa. 1, 301 A.2d 689 (1973).

Mr. Sweger, however, had never explicitly waived his Miranda rights. Although the United States Supreme Court in North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755 (1975), held that an implicit waiver of rights could be found where an accused expresses understanding of his rights and gives a statement without expressly waiving them, the Pennsylvania Supreme Court has chosen a more restrictive view. In Commonwealth v. Bussey, 486 Pa. 221, 404 A.2d 1309 (1979), the court rejected the view in North Carolina v. Butler, supra, and held that the Pennsylvania Constitution requires an explicit waiver of rights in order to obtain an admissible statement in a custodial setting.

In this case Mr. Sweger never waived his right to have counsel present. In fact he told Trooper Brennan that he thought he should consult an attor-

ney — that he shouldn't say anything without a lawyer present. It was after this statement, following the giving of the Miranda rights and the request for a waiver, and in response to a comment made by his mother, that the defendant volunteered what happened without any interrogation by Trooper Brennan. This, of course, was also after he had volunteered the admission of killing his wife in response to another comment by his mother prior to the giving of Miranda rights. The issue, then, is whether Trooper Brennan's interruption of defendant, during this volunteered statement, at a time when he had still not obtained an explicit waiver of rights, renders the remaining portion of that statement inadmissible.

The first two statements are admissible because Trooper Brennan had not conducted any interrogation at that point calculated or likely to evoke admissions. However, when he asked the question "why," without having obtained a waiver of defendant's constitutional rights, there can be no doubt that he was now commencing interrogation calculated and likely to evoke further admissions. Once an accused has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him unless he himself initiates further communications exchanges or conversations with the police. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880 (1981); Wyrick v. Fields, U.S. , 103 S.Ct. 394 (1982).

In the present case, even if defendant's three minute volunteered statement in response to the comment of his mother can be interpreted as a communication, exchange or conversation with Trooper Brennan, it would still have been incumbent upon Trooper Brennan, pursuant to Pennsylvania consti-

tutional law, to obtain an explicit waiver of Miranda rights before he, himself, interrupted the volunteered statement and initiated any interrogation.[2] Since he initiated interrogation for the first time with his question, "why," without having obtained an explicit waiver of constitutional rights, all statements made by defendant after that point must be suppressed.

The first and second statements were volunteered, the second occurring even after defendant had expressed his right to remain silent, but blurted out and not prompted by any interrogation. On these facts we cannot conclude that the statements then made in response to actual questioning by Trooper Brennan were sufficiently an act of free will to purge the taint of failing to obtain an explicit waiver of rights. It is not reasonable to assume that defendant would have continued to volunteer the details then elicited by the specific questions. In fact, it is likely that defendant had, for all intents and purposes, concluded his volunteered statement, after which Trooper Brennan began his interrogation. This interrogation, rather than merely clarifying statements already made, sought details involv-

---

2. If Mr. Sweger, after once invoking his right to remain silent, had, instead of blurting out a statement, indicated to the officer, without prompting, that he had changed his mind and would give a statement after all, it would have been incumbent upon the officer to reiterate the Miranda warnings and obtain an explicit waiver of rights. Commonwealth v. Youngblood, 453 Pa. 225, 307 A.2d 922 (1973). See also Commonwealth v. Nahodil, 462 Pa. 301, 341 A.2d 91 (1975). Likewise, ". . . Even where an accused blurts out a confession, Miranda warnings at least should be necessary before any questions are asked that do anything more than clarify statements already made." Commonwealth v. Simala, 434 Pa. 219, 252 A.2d 575 (1969), as cited in Youngblood.

ing the incident. Accordingly, the following order is entered.

## ORDER OF COURT

And now, this May 10, 1984, it is ordered and directed that all statements made by defendant to Trooper Brennan, at the Carlisle Hospital on Janaury 1, 1984, after the trooper asked the defendant the question "why," are suppressed. The motion to suppress the defendant's statements made on this occasion prior to Trooper Brennan asking the question "why," is denied.