**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 55 MAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of Superior |
| | : | Court at No. 1786 EDA 2017 dated |
| | : | March 6, 2018 Affirming the |
| v. | : | Judgment of Sentence of the |
| | : | Monroe County Court of Common |
| | : | Pleas, Criminal Division, at No. |
| STACY BRITTON, | : | CP-45-CR-0002192-2015 dated |
| | : | January 6, 2017. |
| Appellant | : | |
| | : | ARGUED: November 19, 2019 |

**OPINION**

**JUSTICE BAER**                                         **DECIDED: April 22, 2020**

California law enforcement officers interviewed Appellant Stacy Britton ("Appellant") in her California residence and, unbeknownst to her, recorded those interviews. Over Appellant's objection, the Commonwealth utilized those recordings as evidence to help convict Appellant of murder in Pennsylvania. We granted allowance of appeal to examine whether the California law enforcement officers were acting as agents of the Pennsylvania State Police when they recorded the interviews with Appellant in her California home, and if so, whether Pennsylvania constitutional and statutory protections are available to Appellant under those circumstances. For the reasons discussed below, we conclude that the Superior Court correctly determined that the California law enforcement officers were not acting as agents of the Pennsylvania State Police when they interviewed Appellant. Thus, examination of

whether any Pennsylvania specific constitutional or statutory protections extended to Appellant's situation is unwarranted. Because the Superior Court reached the proper result in this matter, we affirm that court's judgment.

## I. Pertinent Factual Background[1]

In July of 2002, human remains were discovered on a property in Monroe County, Pennsylvania. The remains were from a body which had been dismembered and burned in two, 55 gallon barrels. A forensic examination revealed that the cause of the victim's death was multiple stab wounds and blunt force trauma to the head and torso. The examination further revealed that the victim's head, hands, and legs were amputated postmortem.

At the time of the victim's death, Appellant lived with her then-husband, James Britton ("James"), in Wilkes-Barre, Pennsylvania. On August 24, 2002, the Brittons' home burned down as a result of arson, and the couple moved to California.

In 2003, the victim was identified as Robert Roudebush ("Victim"), a resident of Wilkes-Barre, Pennsylvania. Around the same time that authorities learned of Victim's identity, James, who was incarcerated on charges unrelated to the instant matter, notified his probation officer and, later, the Pennsylvania State Police that he had information about a July 2002 murder of a person named Bob. James told the police that Larry Tooley, the Brittons' next door neighbor in Wilkes-Barre, committed the murder. Nonetheless, the case remained cold.

In 2008, Victim's murder was the subject of an investigating grand jury. During those proceedings, the Brittons testified and again suggested that Larry Tooley had committed Victim's murder. It, however, does not appear that anyone was charged as

---

[1] Our summary of the facts is gleaned from the transcript of Appellant's suppression hearing, N.T., 7/12/2016, and the opinion that the trial court authored in support of its order denying Appellant's motion to suppress, Trial Court Opinion, 10/27/2016.

a result of the grand jury investigation. Consequently, the murder continued to remain unsolved.

On August 14, 2015, Appellant, who was living in San Bernardino County, California, called authorities in Pennsylvania to discuss information that she had regarding a 2002 homicide. More specifically, Appellant informed Monroe County Detective Joseph Coddington that on July 4, 2002, James killed Victim. During the course of their conversation, Appellant stated to the detective that she would prefer to speak to someone in person.

Detective Coddington passed this information along to his colleague, Monroe County Detective Wendy Serfass, who then contacted Corporal Shawn Williams of the Pennsylvania State Police.[2] Corporal Williams called Appellant in California, and she repeated her story that James killed Victim. Appellant also stated that she dismembered the body at James' request and further described how the couple disposed of the body by placing the remains in plastic bags, driving them to a property, and burning them in barrels.

Corporal Williams' colleague, Pennsylvania State Police Corporal Thomas McAndrew, then called the County Sherriff's Department in San Bernardino, California, and eventually spoke to Detective Jon Cahow. Corporal McAndrew provided Detective Cahow with a background of this case and, pursuant to Appellant's request, asked the detective to interview Appellant in person. Corporal McAndrew and Detective Cahow did not discuss instructions on how the California law enforcement officers should conduct their interview with Appellant. The Pennsylvania State Police followed up later by emailing and mailing various reports and files to the San Bernardino County Sherriff's Department.

---

[2] Corporal Williams had worked on the case previously.

On August 17, 2015, Detective Cahow contacted Appellant by phone, and she agreed to meet with the detective and his partner, San Bernardino County Detective Charles Phillips, at the Morongo Sherriff's Station in California, where the detectives interviewed Appellant for several hours. Video and audio recordings were made of the interview, which presumably is legal and done as a matter of protocol in California. Further, there is a sign in the Sheriff's Station where Appellant was interviewed, advising interviewees that video and audio recordings are occurring.

As the interview proceeded, Appellant became tired and concerned that her son needed to go to bed to be ready for school the next day, but she agreed to continue the interview with the detectives at her home. There, the detectives recorded their conversation with Appellant by way of a belt recorder, *i.e.*, an audio recording device that the detectives placed on their belts. During the course of these interviews on August 17th, Appellant initially said that she came home on July 4, 2002, and discovered Victim dead in the basement of her home. However, later in the interviews, she recanted this statement, accepted responsibility for participating in the murder, explained in gruesome detail how she dismembered the body, and laid out how the couple disposed of the remains. Appellant also accused James of starting the fire that burned down their house in August of 2002.[3]

The California detectives returned to Appellant's home the next day and continued interviewing her. They again captured an audio recording of the conversation on a belt recorder. In addition, Detective Phillips utilized a Sherriff-issued iPad to record a video of Appellant demonstrating on a stuffed animal the manner in

---

[3] Pennsylvania State Police Detective Williams later interviewed James, who blamed Appellant for Victim's murder and for burning down the couple's home.

which James killed Victim. Appellant further admitted that she was present for and actively participated in Victim's murder.

Over the course of the two days of interviews, Detective Cahow periodically updated Pennsylvania State Police Corporal McAndrew concerning Appellant's statements. At some point during those conversations, Detective Cahow informed Corporal McAndrew that the California detectives were recording their interviews with Appellant. However, the California detectives never affirmatively informed Appellant that they were recording the interviews, although, as noted above, there was a sign in the Morongo Sheriff's Station advising that audio and video recording was taking place; moreover, Appellant was aware that the California detectives recorded her depiction of the murder on an iPad.

Pennsylvania authorities subsequently arranged for Appellant to return to the Commonwealth, where she was arrested and charged with multiple crimes connected to Victim's murder. The San Bernardino County Sherriff's Department later provided the recordings of Appellant's interviews to the Pennsylvania State Police.

## II. Relevant Procedural History

Appellant filed an omnibus pretrial motion in the Pennsylvania trial court, seeking, *inter alia*, an order suppressing all of the recorded statements that she made to the California authorities in August of 2015. Pertinent to the instant appeal, Appellant averred that the San Bernardino County Sherriff's Department was working at the direction of the Pennsylvania State Police when the San Bernardino County detectives "surreptitiously" recorded her statements. Omnibus Pretrial Motion, 4/29/2016, at ¶¶ 13 & 14. Building on this premise, Appellant asserted that, as agents of the Pennsylvania State Police, the San Bernardino County detectives failed to follow "the dictates of the Pennsylvania [Wiretapping and Electronic Surveillance Control Act

("Pennsylvania Wiretap Act")[4]] and obtain proper authorization under the Act and in violation of [Appellant's rights under the] Fourth and Fourteenth Amendment[s] of the United States Constitution and under Article I, Section [8] of the Pennsylvania Constitution."[5] *Id.* at ¶ 15.

The trial court held a hearing to address the pretrial motions. Relevant to Appellant's motion to suppress, the following witnesses testified: Monroe County Detective Joseph Coddington, San Bernardino County Detective Cahow, and Pennsylvania State Police Corporals Williams and McAndrew. These witnesses testified to, *inter alia*, the facts as outlined above.

After the suppression hearing, the parties submitted briefs in support of their legal positions. Related to her agency theory, Appellant revised her request for relief, seeking suppression only of the statements recorded in her California home. In short, Appellant contended that: (1) because the California law enforcement officers were acting as agents of the Pennsylvania State Police when they interviewed her in her California home, Pennsylvania law controls the legality of their actions in this regard; and (2) both the Pennsylvania Constitution and the Pennsylvania Wiretap Act precluded the California law enforcement officers from secretly recording Appellant in her home. In response, the Commonwealth argued that Appellant's statements were legally obtained in California pursuant to California law.

The trial court denied Appellant's motion to suppress. In its opinion in support of that decision, before turning to Appellant's agency argument, the court initially utilized a thorough conflict-of-law analysis to determine whether Pennsylvania or

---

[4] 18 Pa.C.S. §§ 5701-5782.

[5] These constitutional provisions protect against unreasonable governmental searches and seizures.

California law should govern the admissibility of the recorded statements that Appellant made in California. Trial Court Opinion, 10/27/2016, at 4-10. For present purposes, because the trial court's conflict-of-law analysis is outside the scope of this appeal, it is sufficient to note that the court explained that when an issue implicates substantive laws, such as the privacy rights asserted by Appellant, a conflict-of-law analysis requires the forum court to apply the law of the state with the most interest in the outcome of the controversy. *Id.* at 4-5. The court concluded that California has a higher interest in whether the California law enforcement officers acted legally in recording Appellant. *Id.* at 5-6. The court further concluded that the recordings were lawfully made in accord with California law and, thus, admissible.

Of primary importance to this appeal, the trial court next recognized that Appellant was arguing that San Bernardino County Detectives "Cahow and Phillips, at the time they surreptitiously recorded her during the August 17-18, 2015 interviews, were acting as agents of the Pennsylvania State Police and therefore, those agents must conform to Pennsylvania law." Trial Court Opinion, 10/27/2016, at 10. While the court observed that Appellant "failed to cite to any legal authority to support this position[,]" *id.*, it apparently conducted its own research, concluding that there is no Pennsylvania legal authority that supports Appellant's argument. The court then looked to other jurisdictions that have addressed the issue.

By way of example, the trial court highlighted the Supreme Court of Washington's decision in *State v. Brown*, 940 P.2d 546 (Wash. 1997), which we will summarize briefly. At the request of a Washington police department, California law enforcement officers interviewed Brown, and he confessed to crimes committed in Washington. The California officers recorded the statements without Brown's knowledge, which was legal in California, and prosecutors in Washington utilized those

recorded statements to convict Brown in Washington. On appeal to the Washington Supreme Court, Brown argued that his California statements should have been suppressed because the California officers were acting as agents of the Washington police department, and the surreptitious recordings violated Washington's Privacy Act.

The *Brown* court concluded that, to determine whether the California officers were acting as agents of the Washington police department, the pertinent question was whether the California officers cooperated and helped the Washington police department so extensively that the California officers "did not 'independently' obtain [Brown's] statements." *Brown*, 940 P.2d at 589. In concluding that the California officers were not acting as agents, the *Brown* court found it significant that: (1) the Washington police department merely telephoned the California officers and asked them to get a statement from Brown; (2) the Washington police did not tell the California officers what to ask or how to conduct the interview; and (3) the California officers lawfully and independently recorded Brown's statements under California law. *Id.* at 589-90. For these reasons, the *Brown* court held that the recorded statements were properly admitted at Brown's trial.

Turning back to the case *sub judice*, the trial court found *Brown* to be persuasive, applied that decision to the instant facts, and determined that the San Bernardino County detectives did not act as agents of the Pennsylvania State Police when they interviewed Appellant. *Id.* at 11. In reaching this determination, the court highlighted that the California detectives lawfully recorded their interviews with Appellant, a long-time California resident, pursuant to California law and that both Corporal McAndrew and Detective Cahow credibly testified at the suppression hearing that their conversations did not include instructions on how the California detectives should conduct their interviews with Appellant. *Id.* at 11-12. Consequently, the court

refused to suppress the recordings, concluding that the detectives legally obtained those recordings pursuant to California law. *Id.* at 12.

A jury trial commenced, and the prosecutor presented to the jury, *inter alia*, the recordings of the interviews conducted in Appellant's California home. The jury convicted Appellant of first-degree murder, criminal conspiracy to commit homicide, perjury, and hindering apprehension. As to her murder conviction, the trial court sentenced Appellant to life in prison without the possibility of parole. Appellant filed post-sentence motions, which the court denied.

Appellant appealed to the Superior Court. In so doing, she reiterated her position that Pennsylvania law prohibited the California law enforcement officers from "surreptitiously" recording her when they were in her home because they were acting as agents of the Pennsylvania State Police. In an unpublished memorandum, the Superior Court affirmed Appellant's judgment of sentence, relying upon the trial court's opinion. Thereafter, Appellant filed a petition for allowance of appeal, which this Court granted to address the following question, as phrased by Appellant: "Should out of state law enforcement officers acting within their own state but solely at the request of Pennsylvania law enforcement officers be considered agents of the Pennsylvania law enforcement and as such governed by the same statutory and constitutional standards as the Pennsylvania law enforcement officers?" *Commonwealth v. Britton*, 194 A.3d 1041, 1042 (Pa. 2018).

### III. Parties' Arguments to this Court

The issue before this Court requires that we first determine when a foreign police officer qualifies as an "agent" of a Pennsylvania police force. In offering her view on the topic, Appellant does not discuss *Brown*, *supra*, or any other legal authority that is directly on point. Instead, Appellant supports her position primarily by invoking this

Court's decisions in *Commonwealth v. Dembo*, 301 A.2d 689 (Pa. 1973) (holding that a warrantless, exploratory search of mail by a postal employee at the direction of the Pennsylvania State Police constituted a government search in violation of the Fourth Amendment of the United States Constitution), and *Commonwealth v. Eshelman*, 383 A.2d 838 (Pa. 1978) (concluding that, although an auxiliary officer was off-duty when he conducted a warrantless search of a vehicle, the record nonetheless established that the off-duty officer was acting as a police officer when he removed packages from that vehicle and turned them over to police). In short, Appellant believes that these cases suggest that in determining whether the California law enforcement officers were acting as agents of the Pennsylvania State Police, this Court should focus "on the coordination between Pennsylvania law enforcement and California law enforcement." Appellant's Brief at 16.

Applying this rationale to the facts of the case, Appellant points out that the California detectives would not have interviewed her but for the Pennsylvania State Police's request that they do so. Appellant further highlights that Detective Cahow informed Pennsylvania State Police Corporal McAndrew that he would be interviewing Appellant in her home and that he would be recording that interview; yet, Corporal McAndrew continued to use Detective Cahow's assistance in this matter. Appellant concludes, "The continued use of Detective Cahow knowing that the residence would be entered and the conversations recorded makes Detective Cahow an agent under *Dembo* and *Eshelman*." *Id.*

The Commonwealth's argument is of limited help as it does not squarely address Appellant's agency argument. Rather, the Commonwealth primarily contends that a conflict-of-law analysis, like that performed by the trial court, applies to and permits the secret recording of the statements that Appellant made in her California

home. Commonwealth's Brief at 10-16. Later in its brief, the Commonwealth suggests that, if the Court concludes that the trial court erred by permitting the jury to hear the recordings of Appellant in her home, any such error was harmless. *Id.* at 20-22.

## IV. Discussion

Ultimately, we are reviewing the trial court's denial of Appellant's motion to suppress. This review is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017). Thus, our review of questions of law is *de novo*. *Id.* Our scope of review is limited to considering only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole. *Id.*

As noted above, the issue before this Court requires that we first determine when a foreign police officer qualifies as an "agent" of a Pennsylvania police force. In advancing her position regarding the meaning of "agent" in these circumstances, Appellant relies upon this Court's decisions in *Dembo* and *Eshelman*, which we will briefly discuss at this point. In *Dembo*, Pennsylvania State Police Trooper Alan Phillips received information that Dembo previously had purchased ingredients to manufacture illegal drugs. The trooper then asked postal authorities to inform him if Dembo were to receive any packages in the mail. Two and one-half months later, a postmaster informed Trooper Phillips that a package had arrived for Dembo, and at the trooper's direction, the postal authorities inspected the package and discovered illegal drugs. Dembo later was convicted of drug-related offenses.

On appeal to this Court, Dembo's chief contention was "that opening the package at the post office and inspecting its contents was an unconstitutional search

in violation of the Fourth Amendment." *Dembo*, 301 A.2d at 691. In agreeing with Dembo, the Court observed that, although the postal authorities possessed the discretion to inspect Dembo's mail, the "overwhelming evidence forces the conclusion that this search was initiated by police officials in furtherance of a police investigation then in progress and the postal authorities were merely the means selected in an attempt to avoid the necessity of establishing probable cause." *Id.* at 693. We, therefore, held that the warrantless, exploratory search of mail by a postal employee at the direction of the Pennsylvania State Police constituted a government search in violation of the Fourth Amendment of the United States Constitution.

As noted above, the threshold issue that we must address in the case before us is when does a foreign police officer become an "agent" of a Pennsylvania police force. In other words, we are charged with defining "agent" within this discrete context. *Dembo* is unhelpful in accomplishing this task, as there was no discussion of the boundaries of agency because there was no question in that case that the postal authorities conducted themselves in conformity with the directions of Trooper Phillips. *See Dembo*, 301 A.2d at 693 ("Here, the record is clear that the postal authorities were merely a tool used by the police officials to further a police investigation."). Stated differently, unlike the question currently before the Court, the *Dembo* Court was not faced with developing a test to discern whether an agency relationship existed between a Pennsylvania police department and a foreign police officer operating within the laws of his jurisdiction. In addition and as discussed below, unlike in *Dembo*, here, the Pennsylvania State Police did not direct the mechanics of the California officers' interviews.

*Eshelman* is similarly unhelpful in resolving this appeal. *Eshelman* involved Glenn Decker, an auxiliary policeman for the Borough of Roaring Springs,

Pennsylvania. While off-duty, Decker was on a Pennsylvania property without the owner's permission, when he discovered an old Cadillac surrounded by weeds and without tags. Decker knew the vehicle belonged to Eshelman. Through the windows of the vehicle, Decker observed packages that he suspected contained marijuana. He retrieved the packages from the vehicle, took them to the Roaring Springs' police station, and showed them to his superior officer, who then arranged for Decker to take the packages to the State Police barracks at Hollidaysburg. The packages tested positive for marijuana, and Eshelman eventually was convicted of drug-related crimes.

On appeal to this Court, Eshelman argued that the evidence obtained by Decker should have been suppressed because, at the time of the search, Decker was acting as a police officer "and that, in any event, the exclusionary rule of the Fourth Amendment, as applied to the states by the Fourteenth Amendment, should be extended to evidence improperly obtained by private citizens." *Eshelman*, 383 A.2d at 840 (footnote omitted). This Court agreed that the evidence should have been suppressed, holding, in relevant part, that although Decker was off-duty when he conducted the search of the vehicle, the record evidence established that Decker nonetheless was acting as a police officer when he removed the packages from that vehicle and turned them over to police. *Id.* at 842.

The *Eshelman* Court then bolstered this conclusion by opining that "the conduct of Decker's superior in the police department upon receiving the package from Decker in effect ratified Decker's unauthorized acts on behalf of the Commonwealth." *Id.* In so doing, the Court stated, "It is fundamental agency law that an act outside the scope of one's authority may be ratified by the subsequent conduct or behavior of the principal on whose behalf one purports to be acting." *Id.* While Appellant seems to believe that this statement of the law has some significance to this case, she fails to explain how

this principle establishes that the California detectives were acting as agents of the Pennsylvania State Police. Indeed, a close reading of *Eshelman* reveals that it does not address, either directly or indirectly, the principles at issue in the instant case. Thus, neither *Dembo* nor *Eshelman* provides precedent to guide our analysis.

Nevertheless, this Court is well acquainted with the term "agent." As we observed nearly 175 years ago, "An agent is one who acts in the place and stead of another." *Valentine v. Packer*, 5 Pa. 333, 334 (1847). In the context of agency law, we have explained that "[t]he law is clear in Pennsylvania that the three basic elements of agency are: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) (internal quotation marks omitted) (citing *Scott v. Purcell*, 415 A.2d 56, 60 (Pa. 1980) (quoting Restatement (Second) of Agency § 1, Comment b (1958)).

Applying this definition to the facts of this case, we note that reasonable minds could differ as to whether the Pennsylvania State Police manifested a desire to have the California detectives act on its behalf and whether the California detectives accepted that task. However, we need not delve into those areas, as the last element of the definition simply is not met here. More specifically, the last element of the term "agency" makes clear that an agency relationship is established only when the principal exercises control over the action at hand.

The suppression record is devoid of evidence that would suggest that the Pennsylvania State Police, as the purported principal, exercised any control over the manner in which the California detectives, the purported agents, interviewed Appellant. To the contrary, as explained above, the record unquestionably establishes that the

San Bernardino County detectives interviewed Appellant, a California resident, in a manner that was consistent with California protocol and law. Nothing in the record suggests that the Pennsylvania State Police requested that the California detectives question Appellant in a particular place, at particular time, or in a particular manner, let alone record the interviews. In this regard, it is important to note that the trial court credited the testimony of Pennsylvania State Police Corporal McAndrew and San Bernardino County Detective Cahow that they did not discuss the manner in which the California detectives would interview Appellant at all. Trial Court Opinion, 10/27/2016, at 11-12.

Accordingly, we hold that the lower courts properly determined that the San Bernardino County Sheriff's Department did not act as an agent of the Pennsylvania State Police when the San Bernardino County detectives interviewed Appellant in her California home, as there is no evidence of record that establishes that the Pennsylvania State Police exhibited control over the California detectives.[6, 7] Having reached this conclusion, we need not address Appellant's claim that Pennsylvania

---

[6] While the Washington Supreme Court's decision in *Brown* is not binding on this Court nor discussed by the parties, we nonetheless observe that the result we reach in this case is consistent with the conclusion reached in *Brown.* Stated succinctly, in both cases, the Courts determined that California law enforcement officers were not acting as agents of the forum state's police force when they conducted interviews because the records established that the forum state's police force did not direct or control the actions of the California officers. Rather, the forum state's police force simply telephoned the California officers and asked them to talk to a person.

[7] The concurring justice finds it necessary to ponder our intent in reaching this conclusion and to make unwarranted accusations that we are undermining the protections of the Pennsylvania Constitution. A common sense reading of this Opinion makes clear that we have addressed and disposed of the narrow issue before the Court by assessing the arguments actually presented in the parties' briefs. Contrary to the assertions of the concurring opinion, we are in no way shifting "Article I, Section 8's exclusionary rule from a privacy rationale to one of deterrence." Concurring Opinion at 27. Indeed, by focusing on the narrow issue presented to the Court, we do not reach any constitutional issue and, therefore, are not altering the constitutional landscape.

constitutional and statutory protections extended to the interview conducted in her home. For these reasons, we affirm the Superior Court's judgment, which affirmed Appellant's judgment of sentence.

Chief Justice Saylor and Justices Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht files a concurring opinion.